FILED
NOV 0 1 2005
CLERK

UNITED STATES DISTRICT COURT
DISTRICT OF SOUTH DAKOTA
SOUTHERN DIVISION

| | | |
|---|---|---|
| UNITED STATES OF AMERICA, | * | CR. 04-40109 |
| Plaintiff, | * | |
| vs. | * | REPORT and RECOMMENDATION (Motion to Suppress) |
| NATHAN FLOOD, | * | |
| Defendant. | * | |

Pending is Defendant's Motion to Suppress Evidence (Doc. 39). A hearing was held on Monday, October 24, 2005. Defendant was personally present and represented by his counsel of record, Assistant Federal Public Defender William Delaney. The Government was represented by Assistant United States Attorney Thomas Wright. FBI Agent Douglas Heilman testified at the hearing. Additionally, both parties have submitted briefs and oral argument was heard at the conclusion of the hearing. Based on a careful consideration of all of the evidence, and counsel's written and oral arguments, the Court respectfully makes the following:

## RECOMMENDATION

It is respectfully recommended that Defendant's Motion to Suppress be **DENIED.**

## JURISDICTION

Defendant is charged in an Indictment with abusive sexual contact in violation of 18 U.S.C. §§ 1153, 2241(a)(1), 2241( c) and 2246(3). The pending Motion to Suppress was referred to the Magistrate Judge pursuant to 28 U.S.C. § 636(b)(1)(B) and Judge Piersol's Standing Order dated February 1, 2002.

## FACTUAL BACKGROUND

FBI Agent Douglas Heilman became involved in the investigation of the Defendant, Nathan Flood, regarding the possible sexual abuse of a minor on a South Dakota Indian reservation. TR 5. Agent Heilman had received a referral from a social worker that one of Mr. Flood's minor relatives may have been sexually abused by him. TR 6. That tip led Agent Heilman to interview Mr. Flood on February 19, 2004 at the Charles Mix County Jail day room. TR 6, 9. Mr. Flood was in custody there on unrelated charges. TR 23.

Agent Heilman interviewed Mr. Flood with the assistance of BIA Agent Randy Vettleson. TR 7. Agent Heilman read Mr. Flood his *Miranda* rights from a pre-printed form before the interview began. TR 7-8. Agent Heilman checked off each enumerated right on the form as Mr.

Flood indicated verbally that he understood it. TR 9-10. Mr. Flood, Agent Heilman, and Agent Vettleson all signed the form. TR 8. Mr. Flood acknowledged that he understood his *Miranda* rights, and agreed to speak with the Agents without the assistance of an attorney. EX 1. During the February interview, Mr. Flood discussed but for the most part denied inappropriate behavior with the minor relative during various times he babysat her. TR 11-12, 25-26. The interview lasted approximately one-half hour. TR 23. The Agents terminated the interview because it was becoming obvious Mr. Flood did not want to discuss the allegations, and the interview was non-productive. TR 30-31.

Agent Heilman and Agent Vettleson interviewed Mr. Flood again in April, 2004.[1] TR 12. During this interview, the Agents confronted Mr. Flood with a written copy of an interview the minor relative gave to a child advocacy representative. TR 15. The second interview occurred in Mr. Vettleson's BIA office in Wagner, South Dakota. TR 13. The Agents stopped by Mr. Flood's house (described by Agent Heilman as "a stone's throw" from Agent Vettleson's office) and asked if Mr. Flood would come to Vettleson's office to further discuss the allegations. TR 13-14. Mr. Flood agreed, and the Agents gave him a ride to the office. TR 14. The Agents advised Mr. Flood he was not under arrest, that he could leave at any time, and that the interview was voluntary. TR 14. While the office door was shut, the Agents reiterated that Mr. Flood was free to leave and the interview was voluntary. TR 14.

They discussed the prior interview and read the alleged victim's statement to Mr. Flood. TR 15. Her statement was quite different from Mr. Flood's previous version of the events. TR 15. For example, the alleged victim claimed sexual penetration had occurred, while Mr. Flood had claimed the alleged victim "incidentally" sat on his lap and touched him while she was naked. TR 11, 15. At first, Mr. Flood denied the alleged victim's statements. TR 16, At one point, Mr. Flood said "I just want to get this over with." TR 17. Agent Heilman explained to Mr. Flood he needed to tell the truth, not just agree to something to get the matter over with. Id. Mr. Flood also inquired about what would happen to him within the criminal justice system. TR 16. Finally, Mr. Flood acknowledged the alleged victim was not lying, but he would not discuss the specifics of the allegations. TR 17.

---

[1]Agent Heilman explained he wanted to interview Mr. Flood again because the first interview occurred at the Charles Mix County Jail, which is not conducive to productive interviews. TR 33. Also, Agent Heilman wanted to clarify certain aspects of Mr. Flood's earlier statements–including the location of the incident(s)-- and differences between his statement and the alleged victim's statement. TR 12, 33-34.

Agent Heilman wrote out a statement for Mr. Flood to sign. The statement was a summary of the conversation, written by Agent Heilman in his handwriting, but agreed to by Mr. Flood. TR 18. In other words, Agent Heilman told Mr. Flood what the statement was going to say and read it to Mr. Flood, and Mr. Flood agreed to the language, then Agent Heilman wrote the statement. TR 41-42. Mr. Flood initialed the statement so nothing could be added. TR 43. Mr. Flood's statement was also tape recorded (EX 3). Mr. Flood acknowledged on the tape that he gave the statement freely and voluntarily, and that he was not under the influence of any drugs or alcohol, or being treated for mental illness. Id. Agent Heilman described Mr. Flood as cooperative and somewhat remorseful throughout both the February and April interviews. TR 22. Mr. Flood was not arrested at the conclusion of the April 29 interview. He left Agent Vettleson's office and walked home. Id. He was indicted by the Grand Jury several months later in October, 2004, and was arrested pursuant to a warrant on October 26, 2004. See Doc. 1.

Mr. Flood now moves to suppress the statements he made during both the February 19 and April 29 interviews. He asserts the *Miranda* waiver on February 19 was not valid, so the statements given during that interview should be suppressed. He further asserts the April 29 interview was custodial, and because no *Miranda* warnings were given the statements given on that date should be suppressed as well. Alternatively, Mr. Flood asserts the April 29 interview was not voluntarily given, considering the totality of the circumstances.

**DISCUSSION**

As a general rule, the burden of proof is on the defendant who seeks to suppress evidence. United States v. Phillips, 540 F.2d 319 (8th Cir.1976) cert. denied, 429 U.S. 1000, 97 S.Ct. 530, 50 L.Ed.2d 611 (1976). The Government, however, bears the burden of proving by a preponderance of the evidence that Miranda warnings were either not necessary or that they were given and effectively waived. Miranda v. Arizona, 384 U.S. 436, 475, 86 S.Ct. 1602, 1628, 16 L.Ed.2d 694 (1966); United States v. Short, 790 F.2d 464, 467-68 (6th Cir. 1986); United States v. Charbonneau, 979 F.Supp. 1177, 1181 (S.D. Ohio 1997).

**1. The February 19 Interview**

There is no dispute the *Miranda* warnings were given before the February 19, 2004 interview. There is also no dispute that Mr. Flood signed a written waiver of rights form before the February 19 interview (EX 1). Mr. Flood asserts, however, he did not validly waive his rights. The basis for this claim is not entirely clear. Mr. Flood does assert in his brief that he "has a history of mental problems and is easily led" that he is "easily intimidated and coerced" and that the interview was conducted in an "intimidating and coercive atmosphere."

Mr. Flood's competency has been raised in this case. See Docs. 24,25,26,27 &30. It was first thought he was not competent to assist in his own defense, although he was capable of discerning right from wrong at the time of the alleged offense. (Doc. 24). It was ultimately determined, however, that he was "either manufacturing his symptoms . . .or seriously exaggerating actual symptoms of depression." (Doc. 30). Even if Mr. Flood was in a psychotic state, however, his February 19th *Mirandized* statement is admissible in the absence of police misconduct. See Colorado v. Connelly, 479 U.S. 157, 163-64, 107 S.Ct. 515, 519-20, 93 L.Ed.2d 473 (1986). In Connelly, the United States Supreme Court rejected the notion that "a defendant's mental condition, by itself and apart from its relation to official coercion, should ever dispose of the inquiry into constitutional 'voluntariness.'" Id. 479 U.S. at 164, 107 S.Ct. at 520.

Additionally, Mr. Flood need not have understood every consequence of his decision to speak with Agents Heilman and Vettleson for his *Miranda* waiver to be valid.

> The Constitution does not require that a criminal suspect know and understand every possible consequence of a waiver of the Fifth Amendment privilege. The Fifth Amendment's guarantee is both simpler and more fundamental: a defendant may not be compelled to be a witness against himself in any respect. The *Miranda* warnings protect this privilege by ensuring that a suspect knows that he may choose not to talk to law enforcement officers , to talk only with counsel present, or to discontinue talking at any time. The *Miranda* warnings ensure that a waiver of these rights is knowing and intelligent by requiring that the suspect be fully advised of this constitutional privilege, including the critical advice that whatever he chooses to say may be used against him.

Colorado v. Spring, 479 U.S. 564, 574, 107 S.Ct. 851, 857-58, 93 L.Ed.2d 954 (1987). See also United States v. Peck, 161 F.3d 1171, 1173 (8th Cir. 1998) (lack of awareness of the potential impact of statements is not sufficient to invalidate waiver of the right to counsel); Govt. Of the Virgin Islands v. Kirnon, 377 F.Supp. 601, 613, n. 8 ("intelligent" waiver refers to not whether the defendant made an intelligent decision in the sense that it was wise to admit his participation in a crime, but whether his decision was made "with the full understanding that he need say nothing at all and that he might then consult with a lawyer if he so desired.").

No evidence of police misconduct or coercion was presented regarding the February 19th interview. It was conducted in the Charles Mix County Jail day room, which Agent Heilman candidly admitted was not conducive to productive interviews. There was absolutely no evidence, however, that Agent Heilman or Agent Vettleson threatened or intimidated Mr. Flood in any way on February 19th. Likewise, Mr. Flood presented no evidence that he did not understand what he

said he understood when he signed the waiver of rights form. It is respectfully recommended to the District Court, therefore, that Mr. Flood's motion be DENIED as to the February 19th interview.

**2. The April 29, 2004 Interview**

Mr. Flood asserts the statements he gave on April 29, 2004 should be suppressed because he was in custody and not advised of his *Miranda* rights. Alternatively, Mr. Flood asserts even if he was not in custody, his statements were involuntary because of the coercive and intimidating atmosphere in which the interview was conducted.

**A. Custody**

"Law enforcement officials must administer *Miranda* warnings whenever they interrogate persons in their custody." United States v. Brave Heart, 397 F.3d 1035, 1038 (8th Cir. 2005) (citations omitted). A person is in custody when he is formally arrested or his freedom of movement is restrained to a degree equivalent with formal arrest. Id. To determine whether a person is in custody, the Court looks to the totality of the circumstances confronting the defendant at the time of questioning. The determination is based on the objective circumstances of the interrogation rather than the subjective views harbored by either the officers or the person being questioned. Id. The only relevant inquiry is whether a reasonable person in [Mr. Flood's] position would have felt at liberty to end the interrogation and leave. Id. at 1038-39.

For many years, the Eighth Circuit relied on the various indicia of custody defined in United States v. Griffin, 922 F.2d 1343 (8th Cir. 1990). They are: (1) whether the suspect was informed at the time of questioning that the questioning was voluntary, that the suspect was free to leave or request the officers to do so, or that the suspect was not considered under arrest; (2) whether the suspect possessed unrestrained freedom of movement during questioning; (3) whether the suspect initiated contact with authorities or voluntarily acquiesced to official requests to respond to questions; (4) whether strong arm tactics or deceptive stratagems were employed during questioning; (5) whether the atmosphere of the questioning was police dominated; or (6) whether the suspect was placed under arrest at the termination of the questioning. In United States v. Czichray, 378 F.3d 822, 827 (8th Cir. 2004), however, the Eighth Circuit cautioned the Griffin factors are by no means exhaustive and should not be applied "ritualistically." The Court emphasized "an express advisement that the suspect is not under arrest and that his participation is voluntary" is the most obvious and effective means of demonstrating he has not been taken into custody. Id. at 826. Nonetheless, the Griffin factors still appear in Eighth Circuit case law after

Czichray, and continue to be cited with approval for determining the custody issue. See e.g. United States v. Plumman, 409 F.3d 919, 923 (8th Cir. 2005).

Mr. Flood was informed the questioning was voluntary, that he was not under arrest, and that he was free to leave at any time. He was informed that while the door was shut, he was free to leave. While the contact was initiated by Agents Vettleson and Heilman, Mr. Flood voluntarily rode with them to the BIA office, which was just down the street from his house. Mr. Flood acknowledged in writing and on the transcript of the taped oral statement he gave that no threats were made against him. While the interview did occur at the BIA office, there was no evidence presented that Mr. Flood was coerced or intimidated in any way, and he was not arrested at the end of the interview, but left the BIA office and walked home. Most importantly, no reasonable person would have felt he was under arrest after being assured he was not under arrest, that the interview was voluntary, and that he could leave at any time. Considering the totality of the circumstances, Mr. Flood was not in custody when Agents Heilman and Vettleson interviewed him on April 29, 2004.

**B. Voluntariness**

"A statement is involuntary when it is extracted by threats, violence, or express or implied promises sufficient to overbear the defendant's will and critically impair his capacity for self-determination." Brave Heart, 397 F.3d at 1040 (citations omitted). To determine whether the defendant's will was overborne, the Court examines the totality of the circumstances, including the conduct of law enforcement personnel in exerting pressure on the defendant to confess and the defendant's ability to resist that pressure. Id.

No evidence was presented that Agents Heilman or Vettleson exerted any force, used any violence, or made any threats against Mr. Flood. On the contrary, Mr. Flood agreed orally and in writing that no threats or promises were made. At most, the Agents confronted Mr. Flood with the alleged victim's version of events, which was different from Mr. Flood's. Likewise, there was no evidence the Agents deceived Mr. Flood in any way. Mr. Flood exhibited an ability to resist pressure, because he maintained his refusal to explain what happened, but instead insisted on merely agreeing with the alleged victim's version of events. The record as a whole demonstrates that Mr. Flood made his statements voluntarily, not "because the environment and nature of the questioning was so coercive that it overbore his will and critically impaired his capacity for self-determination." Id. at 1041.

## CONCLUSION

Mr. Flood's February 19, 2004 interview was custodial, but the *Miranda* rights were given and Mr. Flood validly waived them before the interview began. It is therefore respectfully recommended his Motion to Suppress be DENIED as to the February 19 interview. The April 29, 2004 interview was not custodial, so no *Miranda* warnings were necessary. Further, Mr. Flood's statements were voluntarily given during the April 29, 2004 interview. It is therefore respectfully recommended that Mr. Flood's Motion to Suppress be DENIED as to the April 29, 2004 interview as well.

## NOTICE TO PARTIES

The parties have ten (10) days after service of this Report and Recommendation to file written objections pursuant to 28 U.S.C. § 636(b)(1), unless an extension of time for good cause is obtained. Failure to file timely objections will result in the waiver of the right to appeal questions of fact. Objections must be timely and specific in order to require de novo review by the District Court.

Thompson v. Nix, 897 F.2d 356 (8th Cir. 1990)
Nash v. Black, 781 F.2d 665 (8th Cir. 1986).

Dated this 1st day of November, 2005.

BY THE COURT:

John E. Simko
United States Magistrate Judge

ATTEST:

JOSEPH HAAS, Clerk
By Shelly Margulies, Deputy
(SEAL)